Rebecca L. Davis (State Bar No. 271662)
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland, CA 94612
Phone: (510) 836-4200
Email: rebecca@lozeaudrury.com

Barak Kamelgard (State Bar No. 298822)
Benjamin Harris (State Bar No. 313193)
LOS ANGELES WATERKEEPER
360 E 2nd Street, Suite 250
Los Angeles, CA 90012
Phone: (310) 394-6162
Email: barak@lawaterkeeper.org
       ben@lawaterkeeper.org

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a California nonprofit corporation, | Case No. _____ |
| Plaintiff, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES |
| vs. | |
| ALLIED WASTE TRANSFER SERVICES OF CALIFORNIA, LLC, a California limited liability company, | (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |
| Defendant. | |

LOS ANGELES WATERKEEPER ("LA Waterkeeper" or "Plaintiff"), a

California nonprofit corporation, by and through its counsel, hereby alleges:

COMPLAINT                                          1

## I.      JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On October 23, 2023, Plaintiff provided notice of Allied Waste Transfer Services of California, LLC's ("Allied Waste" or "Defendant") violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of LA Waterkeeper's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Central District of California pursuant to Section

505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.    INTRODUCTION

5.     This complaint seeks relief from Defendant's discharges of polluted storm water from Defendant's industrial facility located at 3031 East I Street in Wilmington, California, 90744, known as Falcon Refuse Center ("Facility"). These discharges and related procedural, planning, and reporting omissions are in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ, as renewed by Water Quality Order No. 2015-0057-DWQ, and as further amended on November 6, 2018 ("General Permit"). Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

6.     With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

7.     The Dominguez Channel Estuary and Los Angeles Harbor are ecologically robust areas and important habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that Los Angeles area waters have for people in the surrounding communities. The public's use of Los Angeles area waters for water contact sports exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreation and aesthetic

opportunities, such as wildlife observation are also impaired by polluted discharges into Los Angeles area waters.

### III.  **PARTIES**

8.      Plaintiff LOS ANGELES WATERKEEPER is a nonprofit public benefit corporation organized under the laws of the State of California with its main office in Los Angeles, California. Founded in 1993, LA Waterkeeper is dedicated to the preservation, protection, and defense of the inland and coastal surface and groundwaters of Los Angeles County from all sources of pollution and degradation. LA Waterkeeper and its members are deeply concerned with protecting the environment in and around their communities, including Dominguez Channel Estuary and Los Angeles and Long Beach Harbors. To further these goals, LA Waterkeeper actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

9.      LA Waterkeeper has members living in the communities near the Facility and Dominguez Channel Estuary and the Los Angeles and Long Beach Harbors, and the bordering parks and pathways. They enjoy using Dominguez Channel Estuary and the Los Angeles and Long Beach Harbors and adjacent waters for recreation and other activities. Members of LA Waterkeeper use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause pollutants to be discharged. Members of LA Waterkeeper use those areas to recreate and view wildlife, among other activities. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of LA Waterkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

10.     LA Waterkeeper brings this action on behalf of its members. LA

Waterkeeper's interest in reducing Defendant's discharges of pollutants into Dominguez Channel Estuary and the Los Angeles and Long Beach Harbors and its tributaries and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of LA Waterkeeper.

11.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

12.     Defendant Allied Waste Transfer Services of California, LLC ("Allied Waste" or "Defendant") is a California limited liability company that owns and/or operates the Facility.

## IV.  STATUTORY BACKGROUND

### Clean Water Act

13.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

14.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

15.     The EPA promulgated regulations for the Section 402 NPDES permit

program defining waters of the United States. S*ee* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The Act requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

16.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**General Permit**

17.     The State Board elected to issue a statewide general permit for industrial storm water discharges ("General Permit"). The State Board originally issued the General Permit on or about November 19, 1991. The State Board modified the General Permit on or about September 17, 1992. The State Board reissued the General Permit on or about April 17, 1997, and again on or about April 1, 2014, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). On November 6, 2018, the General Permit was further amended to include additional effluent limitations and numeric action levels to be applied to industrial permittees that discharge storm water to waters that have been identified as impaired pursuant to Section 303(d) of the Act, 33 U.S.C. § 1313(d), including the Los Angeles/Long Beach Harbor Waters for, among other things, zinc, copper, and lead.

18.     In order to discharge storm water lawfully in California, industrial facilities must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

19.     The General Permit contains several prohibitions. Effluent Limitation

V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. General Permit § V.A. Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. General Permit § III.C. Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. General Permit § VI.B. Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. General Permit §§ VI.A, III.D

20.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI"). Dischargers have been required to file NOIs since March 30, 1992.

21.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best

management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. *See* General Permit, § X.C. These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates. To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X.B. Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet § I(1).

22.     Sections X.D-I of the General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of industrial materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges. The General Permit requires that all dischargers develop and implement a set of minimum BMPs (which are mostly non-structural BMPs) as well as any advanced BMPs (which are mostly structural) as necessary to achieve BAT/BCT, which serve as the basis for compliance with the General Permit's technology-based effluent limitations. *See* General Permit § X.H. The General Permit requires a comprehensive assessment of potential pollutant sources, specific BMP descriptions; and a BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented. *See* General Permit §§ X.G.2, 4-5. Section X.E of the General Permit requires that the SWPPP map depict, *inter alia*, all storm water discharge locations.

23.     The General Permit requires dischargers to implement and maintain, to

the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping. *See* General Permit, § X.H.1. Failure to implement all of these minimum BMPs is a violation of the General Permit. *See* General Permit Fact Sheet § I(2)(o).

24.     The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. *See* General Permit, § X.H.2. Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. *Id*. The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table. *See* General Permit § X.H.4-5.

25.     A facility must "ensure that the SWPPP identifies and justifies each minimum BMP or applicable advanced BMP not being implemented at the facility because they do not reflect best industry practice considering technological availability and economic practicability and achievability." General Permit, § X.H.4.b. A facility's SWPPP must also identify where the minimum BMPs in different areas of the facility will not adequately reduce the pollutants in the facility's storm water dischargers and identify advanced BMPs for those areas. General Permit § X.G.2. A Facility's BMPs must, at all times, be robust enough to meet the requirement of the General Permit and of 33 U.S.C. § 1342(p)(3)(A) that all discharges associated with industrial activities be subjected to BAT and BCT. General

Permit §§ V.A, I.A.1, I.D.31-32.

26.     The General Permit requires facility operators to develop and implement an adequate Monitoring Implementation Plan for visual observations and for the sampling and analysis of storm water discharges. *See* General Permit, §§ X.I, XI. The primary objective of such monitoring is to both observe and to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations. Adequate monitoring and reporting ensure that BMPs are effectively reducing and/or eliminating pollutants at a facility, and are evaluated and revised whenever appropriate to ensure compliance with the General Permit.

27.     Under the General Permit, facilities must analyze storm water samples for total suspended solids ("TSS"), O&G, pH, "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, " "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix," and additional parameters applicable based on a facility's Standard Industrial Classification ("SIC") code. General Permit, § XI.B.6.

28.     Facilities are required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event. General Permit, § XI.A. The General Permit requires each discharger to maintain records of all of the visual observations required by the Permit. General Permit, § XI.A.3.

29.     Section XI.B.2 of the General Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the

second half of each reporting year (January 1 to June 30). Storm water discharges trigger the sampling requirement under the General Permit when they occur during facility operating hours and are preceded by 48-hours without storm water discharge. General Permit, § XI.B. A sample must be collected from each discharge point at the facility within four hours of the start of the discharge or the start of facility operations if the discharge occurs within the previous 12-hour period. General Permit, § XI.B.5.

30.     The General Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location. General Permit, § XI.A.2. "The Discharger shall visually observe and record the presence or absence of floating and suspended materials, oil and grease, discolorations, turbidity, odors, trash/debris, and source(s) of any discharged pollutants." *Id*., § XI.A.2.c.

31.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, § XV. Per Section XV.F of the General Permit, a facility's Annual Evaluation must include "[a] review and effectiveness assessment of all BMPs for each area of industrial activity and associated potential pollutant sources to determine if the BMPs are properly designed, implemented, and are effective in reducing and preventing pollutants in industrial storm water discharges and authorized NSWDs." After conducting the Annual Evaluation, "[t]he Discharger shall revise the SWPPP, as appropriate, and implement the revisions within 90 days of the Annual Evaluation." *Id*. The General Permit then requires that a Discharger submit an Annual Report which includes the date of the Annual Evaluation as well as "[a]n identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year." General Permit § XVI.

32.     The General Permit does not provide for any mixing zones by dischargers. The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

33.     The General Permit establishes annual Numeric Action Levels ("NALs") and instantaneous maximum NALs. The following annual NALs have been established under the General Permit for pollutants applicable to Allied Waste: total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; zinc – 0.26 mg/L; aluminum, - 0.75 mg/L; copper – 0.0332 mg/L; iron – 1 mg/L; chemical oxygen demand ("COD") – 120 mg/L; and lead – 0.262 mg/L. The following instantaneous Maximum NALs have been established under the General Permit for pollutants applicable to Allied Waste: TSS – 400 mg/L; O&G – 25 mg/L; and pH – less than 6 greater than 9 s.u.

34.     The General Permit requires that a Discharger compare the results of its storm water discharge samples to the adopted annual NALs and instantaneous maximum NALs. General Permit § XII.A. An exceedance of an annual NAL occurs when the average of the analytical results for a pollutant obtained for all samples at the entire facility during a single reporting year is greater than the pollutant's annual NAL. The reporting year runs from July 1 to June 30. An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range (for pH).

35.     If sampling results for a given parameter indicate an NAL exceedance for that same parameter, the Discharger attains "Level 1 status," which commences on July 1 following the reporting year during which the exceedance occurred. General Permit § XII.C.

36.     By October 1 following commencement of Level 1 status, the Discharger must complete a Level 1 Exceedance Response Action ("ERA") Evaluation. General Permit § XII.C.1. As part of the Level 1 ERA Evaluation, the Discharger must "[i]dentify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances." *Id.* No later than January 1 following commencement of Level 1 status, the Discharger must submit via SMARTS a Level 1 ERA Report. General Permit § XII.C.2. The Level 1 ERA report must be prepared by a Qualified Industrial Stormwater Practitioner ("QISP") and must contain "[a] summary of the Level 1 ERA Evaluation" and "[a] detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL." *Id.* A Discharger can move back to Baseline status from Level 1 status only when: (1) a Level 1 ERA report has been completed; (2) all identified additional BMPs have been implemented; and (3) results from four consecutive QSEs sampled after BMP implementation indicate no additional NAL exceedances for that parameter." *Id.*

37.     If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status." General Permit § XII.D. For Level 2 Status, a discharger is required to submit an ERA Action Plan and an ERA Technical Report requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background. General Permit § XII.D. To return to baseline status from Level 2, a discharger must (1) submit an ERA Technical Report that includes an Industrial Activity BMPs Demonstration, (2) implement BMPs to prevent future exceedances for the Level 2 parameter, and (3) obtain sampling results from four subsequent consecutive QSEs that indicate no additional exceedances for that

parameter. General Permit § XII.D.4.a.

38.     EPA has established benchmark values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish. The following EPA benchmarks have been established for pollution parameters applicable to the Facility: TSS – 100 mg/L; aluminum – 1.1 mg/L; COD – 120 mg/L; copper – 0.0048 mg/L; lead – 0.21 mg/L; and zinc – 0.09 mg/L.

**Basin Plan**

39.     The Regional Board has identified beneficial uses and established water quality standards for the Dominguez Channel Watershed and the Los Angeles and Long Beach Harbors, and established water quality standards for these waters in the "Water Quality Control Plan, Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties," generally referred to as the Basin Plan.

40.     The beneficial uses of these waters include, among others, commercial and sport fishing, estuarine habitat, marine habitat, wildlife habitat, and habitat for rare, threatened, or endangered species, migration of aquatic organisms, spawning, reproduction, and/or early development, navigation, water contact recreation, and noncontact water recreation. Noncontact water recreation use is defined as "Uses of water for recreational activities involving proximity to water, but not normally involving body contact with water, where ingestion of water is reasonably possible. These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities." Contact recreation

includes swimming, wading, water-skiing, skin and scuba diving, surfing, whitewater activities, fishing, and uses of natural hot springs.

41.     Discharges of pollutants at levels above water quality standards contribute to the impairment of beneficial uses of the waters receiving the discharge, in violation of the General Permit.

42.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."

43.     The Basin Plan includes contains a narrative floating material standard which states, "Waters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."

44.     The Basin Plan includes a narrative oil and grease standard which states, "Waters shall not contain oils, greases, waxes or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."

45.     The Basin Plan includes a narrative solid, suspended and settleable materials standard which states, "Waters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses."

46.     The Basin Plan provides, "The pH of bays or estuaries waters shall not be depressed below 6.5 or raised above 8.5 as a result of waste discharges."

47.     The EPA has adopted saltwater numeric water quality standards for zinc of 0.09 mg/L (Criteria Maximum Concentration – "CMC"); for copper of 0.0048 mg/L (CMC); and for lead 0.21 mg/L (CMC). 40 C.F.R. 131.38 (California Toxics Rule ["CTR"]).

48.     The EPA 303(d) List of Water Quality Limited Segments lists the Dominguez Channel Estuary as impaired for DDT, lead, copper, toxicity, indicator bacteria, and PCBs, among other pollutants. *See* Final 2018 California Integrated Report, Appendix A: 2018 303(d) List of Impaired Waters, available at: https://www.waterboards.ca.gov/water_issues/programs/water_quality_assessment/2018_integrated_report.html. The Los Angeles Harbor Consolidated Slip is impaired for DDT, cadmium, zinc, mercury, copper, lead, and PCBs, among other pollutants. *Id*. The Inner Los Angeles Harbor is impaired for copper and zinc, among other pollutants. *Id*. The Outer Los Angeles Harbor is impaired for DDT, PCBs, and toxicity. *Id*. The Draft California 2024 Integrated Report's 303(d) List of Water Quality Limited Segments lists the Outer Los Angeles Harbor as impaired for copper, among other pollutants. *See* Draft 2024 California Integrated Report, Appendix A: Recommended 2024 303(d) List of Impaired Waters, available at: https://www.waterboards.ca.gov/water_issues/programs/water_quality_assessment/2024-integrated-report.html. Industrial facilities, like Defendant's, which are discharging polluted storm water and non-storm water, contribute to the impairment of the Dominguez Channel Estuary, the Los Angeles Harbor Consolidated Slip, and the Inner and Outer Los Angeles Harbors, and aquatic-dependent wildlife.

49.     On November 6, 2018, the State Board amended the General Permit to include TMDL Numeric Action Levels ("TNALs") for certain pollutants in certain watersheds of the State that are impaired by pollutants. Effective July 1, 2020, the General Permit establishes instantaneous maximum TNALs for bacteria being discharged into Los Angeles Harbor: enterococcus – density of 104/100 mL; fecal coliform – density of 400/100 mL; total coliform – density of 10,000/100 mL or 1,000/100 mL if the ratio of fecal-to-total coliform exceeds 0.1. General Permit, Attachment E, Table E-2, p. 33.

50.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen

enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $64,618 per day per violation, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.   STATEMENT OF FACTS

51.   Defendant owns and/or operates the Falcon Refuse Facility, in Wilmington, California. The Facility is a transfer station that is permitted to transfer 1,850 tons per day of municipal solid waste, green waste, and concrete and asphalt from collection vehicles and private customers to larger transfer trucks. Waste transfer activities at the Facility include unloading of collection trucks, loading of larger haul vehicles, sorting of materials, equipment washing, and hazardous materials storage.

52.   In addition to waste transfer activities, the Facility also serves as a maintenance facility for some waste collection vehicles used in the County of Los Angeles. These activities include vehicle and equipment maintenance, tire changes and repairs, and vehicle and equipment washing, among other activities.

53.   The majority of the Facility is paved and used for storing trucks and storage bins, transporting and sorting waste materials throughout the site, vehicle and equipment parking and refueling, and truck queuing and weighing at scales, among other activities. Transfer, sorting, and the movement of materials is conducted both inside and outside of the Transfer Station Building, which located in the center of the Facility.

54.   Plaintiff is informed and believes, and thereupon alleges that, that Defendant has operated the facility since prior to December 10, 2018.

55.   Plaintiff is informed and believes, and thereupon alleges that, on or

before 2015, Defendant filed a Notice of Intent enrolling the Facility in the Geneal Permit.

56.     Plaintiff is informed and believes, and thereupon alleges that, on or around July 2, 2020, Defendant filed an updated Notice of Intent ("NOI") with the State Board.

57.     The Facility's NOI lists the Facility's SIC codes as 4212 ("Local Trucking Without Storage") and 5093 ("Scrap and Waste Materials").

58.     The State Board's electronic SMARTS database lists the current Facility Waste Discharge Identification ("WDID") number as 4 19I022478.

59.     The Facility collects stormwater from its 11.79-acre site and discharges storm water from at least four discharge locations at the Facility.

60.     According to the SWPPP, four drainage areas have been identified at the Facility. Stormwater from drainage areas 1, 2, and 3 flow by sheet flow and through trench drains to pumps that direct the stormwater through a series of 30-yard stormwater treatment boxes ("SWTBs"). Stormwater is then discharged from the bottom of the SWTBs and into the municipal storm drain system via a connected pipe. The Facility's SWPPP indicates that stormwater from Drainage Area 4 sheet flows towards the southeast corner of the Facility and largely infiltrated into the soil, but upon saturation discharges into the intersection of Cervera Avenue and East I Street where it flows into the municipal storm drains.

61.     The Facility operates Monday through Friday, from 8 a.m. to 5 p.m.

62.     Plaintiff is informed and believes, and thereupon alleges that storm water from the Facility is discharged to the local municipal storm water system which empties into the Dominguez Channel Estuary, which flows into the Consolidated Slip of Los Angeles Harbor, then into Inner Los Angeles Harbor, Outer Los Angeles Harbor, and ultimately the Pacific Ocean.

63.     The Dominguez Channel Estuary, Consolidated Slip of Los Angeles

Harbor, Inner Los Angeles Harbor, Outer Los Angeles Harbor, and Pacific Ocean are each a water of the United States.

64.     Plaintiff is informed and believes, and thereupon alleges that storm water flows over the surface of the Facility where industrial activities occur, including activities associated with transfer, storage, and disposal of numerous types of materials handled by the Facility, and the storage, maintenance, and use of vehicles and equipment used for materials collection and handling.

65.     Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects particulates, bacteria, and metals including aluminum, copper, iron, lead, and zinc, and other pollutants as it flows towards the storm water discharge locations.

66.     Plaintiff is informed and believes, and thereupon alleges that all storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

67.     Plaintiff alleges that Defendant has not implemented BMPs that achieve BAT/BCT at the Facility.

68.     The levels of TSS in storm water detected at the Facility have exceeded the annual NAL and the benchmark value for TSS of 100 mg/L established by the General Permit and EPA. During the 2023-2024 Reporting Year, as of the date of this Complaint, the average level of TSS measured in the storm water samples collected by Defendant is 292.77 mg/L. During the 2022-2023 Reporting Year, the average level of TSS measured in the storm water samples collected by Defendant was 199.32 mg/L.  During the 2021-2022 Reporting Year, the average level of TSS measured in the storm water samples collected by Defendant was 300.53 mg/L. During the 2020-2021 Reporting Year, the average level of TSS measured in the storm water samples collected by Defendant was 201.17 mg/L. During the 2019-2020 Reporting Year, the

average level of TSS measured in the storm water samples collected by Defendant was 299.44 mg/L. During the 2018-2019 Reporting Year, the average level of TSS measured in the storm water samples collected by Defendant was 228.37 mg/L. Each of these average annual levels exceed the annual NAL for TSS.

69.     The levels of TSS in storm water detected at the Facility have also exceeded the instantaneous NAL for TSS of 400 mg/L established by the General Permit. During the 2018-2019, 2019-2020 and 2021-2022 Reporting Years, two analytical results from samples taken from the Facility exceeded the instantaneous maximum NAL for TSS of 400 mg/L.

70.     The levels of aluminum in storm water detected at the Facility have exceeded the annual NAL for aluminum of 0.75 mg/L and the benchmark value for aluminum of 1.1 mg/L established by the General Permit and EPA. During the 2023-2024 Reporting Year, as of the date of this Complaint, the average level of aluminum measured in the storm water samples collected by Defendant is 4.98 mg/L. During the 2022-2023 Reporting Year, the average level of aluminum measured in the storm water samples collected by Defendant was 2.91 mg/L. During the 2021-2022 Reporting Year, the average level of aluminum measured in the storm water samples collected by Defendant was 5.90 mg/L. During the 2020-2021 Reporting Year, the average level of aluminum measured in the storm water samples collected by Defendant was 2.50 mg/L. During the 2019-2020 Reporting Year, the average level of aluminum measured in the storm water samples collected by Defendant was 4.64 mg/L. During the 2018-2019 Reporting Year, the average level of aluminum measured in the storm water samples collected by Defendant was 4.49 mg/L. Each of these average annual levels exceed the annual NAL and benchmark for aluminum.

71.     The levels of copper in storm water detected at the Facility have exceeded the annual NAL for copper of 0.0332 mg/L and the benchmark value for

copper of 0.0048 mg/L established by the General Permit and EPA. During the 2023-2024 Reporting Year, as of the date of this Complaint, the average level of copper measured in the storm water samples collected by Defendant is 0.25 mg/L During the 2022-2023 Reporting Year, the average level of copper measured in the storm water samples collected by Defendant was 0.10 mg/L. During the 2021-2022 Reporting Year, the average level of copper measured in the storm water samples collected by Defendant was 0.17 mg/L. During the 2020-2021 Reporting Year, the average level of copper measured in the storm water samples collected by Defendant was 0.07 mg/L. During the 2019-2020 Reporting Year, the average level of copper measured in the storm water samples collected by Defendant was 0.13 mg/L. During the 2018-2019 Reporting Year, the average level of copper measured in the storm water samples collected by Defendant was 0.05 mg/L. Each of these average annual levels exceed the annual NAL and benchmark for copper.

72.     Storm water samples collected by the Defendant demonstrate that discharges from the Facility contain concentrations of copper that cause or contribute to a violation of the applicable water quality standard in the CTR. For example, storm water samples collected by Defendant on November 15, 2023, March 29, 2023, February 24, 2023, November 8, 2022, December 23, 2021, October 25, 2021, March 15, 2021, March 10, 2021, January 29, 2021, March 12, 2020, December 4, 2019, November 27, 2019, February 14, 2019, January 31, 2019, and January 14, 2019 all contained concentrations of copper at levels which exceed the CMC of 0.0048 mg/L for copper set forth in the CTR.

73.     The levels of iron in storm water detected at the Facility have exceeded the annual NAL for iron of 1 mg/L established by the General Permit. During the 2023-2024 Reporting Year, as of the date of this Complaint, the average level of iron measured in the storm water samples collected by Defendant is 7.16 mg/L. During the 2022-2023 Reporting Year, the average level of iron measured in the storm water

samples collected by Defendant was 5.17 mg/L. During the 2021-2022 Reporting Year, the average level of iron measured in the storm water samples collected by Defendant was 7.51 mg/L. During the 2020-2021 Reporting Year, the average level of iron measured in the storm water samples collected by Defendant was 5.88 mg/L. During the 2019-2020 Reporting Year, the average level of iron measured in the storm water samples collected by Defendant was 9.67 mg/L. During the 2018-2019 Reporting Year, the average level of iron measured in the storm water samples collected by Defendant was 9.08 mg/L. Each of these average annual levels exceed the annual NAL for iron.

74.     The levels of zinc in storm water detected at the Facility have exceeded the annual NAL for zinc of 0.26 mg/L and the benchmark value for zinc of 0.09 mg/L established by the General Permit and EPA. During the 2023-2024 Reporting Year, as of the date of this Complaint, the average level of aluminum measured in the storm water samples collected by Defendant is 0.84 mg/L. During the 2022-2023 Reporting Year, the average level of zinc measured in the storm water samples collected by Defendant was 0.52 mg/L. During the 2021-2022 Reporting Year, the average level of zinc measured in the storm water samples collected by Defendant was 0.76 mg/L. During the 2020-2021 Reporting Year, the average level of zinc measured in the storm water samples collected by Defendant was 0.41 mg/L. During the 2019-2020 Reporting Year, the average level of zinc measured in the storm water samples collected by Defendant was 0.73 mg/L. During the 2018-2019 Reporting Year, the average level of zinc measured in the storm water samples collected by Defendant was 0.40 mg/L. Each of these average annual levels exceed the annual NAL and benchmark for zinc.

75.     Storm water samples collected by the Defendant demonstrate that discharges from the Facility contain concentrations of zinc that cause or contribute to

a violation of the applicable water quality standard in the CTR. For example, storm water samples collected by Defendant on November 15, 2023, March 29, 2023, February 24, 2023, November 8, 2022, December 23, 2021, October 25, 2021, March 15, 2021, March 10, 2021, January 29, 2021, March 12, 2020, December 4, 2019, November 27, 2019, February 14, 2019, January 31, 2019, and January 14, 2019 all contained concentrations of zinc at levels which exceed the CMC of 0.09 mg/L for zinc set forth in the CTR.

76.    The levels of COD in storm water detected at the Facility have exceeded the annual NAL and the benchmark value for COD of 120 mg/L established by the General Permit and EPA. During the 2023-2024 Reporting Year, as of the date of this Complaint, the average level of COD measured in the storm water samples collected by Defendant is 1,318.67 mg/L. During the 2022-2023 Reporting Year, the average level of COD measured in the storm water samples collected by Defendant was 576.8 mg/L. During the 2021-2022 Reporting Year, the average level of COD measured in the storm water samples collected by Defendant was 1,074.5 mg/L. During the 2020-2021 Reporting Year, the average level of COD measured in the storm water samples collected by Defendant was 414.5 mg/L. During the 2019-2020 Reporting Year, the average level of COD measured in the storm water samples collected by Defendant was 774.4 mg/L. During the 2018-2019 Reporting Year, the average level of COD measured in the storm water samples collected by Defendant was 470.2 mg/L. Each of these average annual levels exceed the annual NAL and benchmark for COD.

77.    The levels of pH in storm water detected at the Facility were outside of the instantaneous NAL and benchmark value for pH of less than 6.0 greater than 9.0 s.u. established by the General Permit and EPA. For example, during the 2022-2023 Reporting Year, two analytical results from samples taken from the Facility for pH were outside of the instantaneous maximum NAL range for pH. The pH level of storm

water discharge samples collected by Defendant was below 6.0 s.u. on the following dates: November 8, 2022, October 25, 2021, and March 10, 2021.

78.  The levels of pH in storm water detected at the Facility have also exceeded the water quality standard for pH of less than 6.5 or greater than 8.5 s.u. established in the Basin Plan. The pH level of storm water discharge samples collected by Defendant was below 6.0 s.u. on the following dates: November 15, 2023, February 24, 2023, November 8, 2022, October 25, 2021, March 15, 2021, March 10, 2021, January 29, 2021, March 12, 2020, December 4, 2019, November 27, 2019, February 14, 2019, January 31, 2019, and January 14, 2019. Each of these analytical results from samples taken from the Facility for pH were outside the bounds of the Basin Plan water quality standard for pH.

79.  The levels of O&G in storm water detected at the Facility have exceeded the annual NAL for O&G of 15 mg/L established by the General Permit. During the 2022-2023 Reporting Year, three analytical results from samples taken from the Facility exceeded the annual maximum NAL for O&G of 15 mg/L, including one analytical result which exceeded the instantaneous maximum NAL for O&G of 25 mg/L.

80.  Plaintiff is informed and believes, and thereupon alleges, that storm water discharges have occurred from the Facility on the dates listed in Attachment A of Exhibit A to this Complaint.

81.  On information and belief, Plaintiff alleges that since at least December 10, 2018, Defendant has failed to implement BAT and BCT at the Facility for its discharges of TSS, aluminum, copper, iron, zinc, COD, pH, O&G and other potentially un-monitored pollutants such as bacteria. Effluent Limitation V.A of the General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than

October 1, 1992. The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. *See* General Permit, § X.H.2. Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. *Id*. A Facility's BMPs must, at all times, be robust enough to meet the General Permit's and 33 U.S.C. § 1342(p)(3)(A)'s requirement that all discharges associated with industrial activities be subjected to BAT and BCT. General Permit §§ V.A, I.A.1, I.D.31-32.

82.     Based on the pollutant levels in the Facility's storm water discharges, the BMPs implemented to date at the Facility do not represent BAT and BCT.  Plaintiff is informed and believes, and thereupon alleges that Falcon Refuse installed a series of storm water treatment boxes in 2016. However, based on the Facility's continued exceedances of NALs, Plaintiff is informed and believes, and thereupon alleges, that the SWTBs are undersized, improperly installed or maintained, or otherwise insufficient to reduce TSS, aluminum, copper, iron, zinc, COD, pH, and O&G below NALs and water quality objectives for these pollutants. A larger or otherwise more robust treatment system or other additional advanced BMPs are available that can be feasibly installed and operated at the Facility. As of the date of this Complaint, Defendant has failed to implement minimum BMPs and advanced BMPs that achieve BAT and BCT.

83.     Plaintiff alleges that Defendant has been conducting, and continues to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP.

84.     Plaintiff alleges that Defendant has failed and continues to fail to collect storm water discharge samples from all outfalls for all pollutants during all QSEs as required by Section XI.B.3 of the General Permit as follows:

- Failure to collect and analyze one of the two required samples during the first half of the 2018-2019 reporting year.

- Failure to collect and analyze one of the two required samples during the second half of the 2019-2020 reporting year.

- Failure to collect and analyze either of the two required samples during the first half of the 2020-2021 reporting year.

- Failure to collect and analyze either of the two required samples during the second half of the 2021-2022 reporting year.

- Failure to collect and analyze one of the two required samples during the first half of the 2022-2023 reporting year.

- Failure to collect and analyze one of the two required samples during the first half of the 2023-2024 reporting year.

85.     Precipitation data obtained from the National Oceanic and Atmospheric Administration demonstrates that there were numerous QSEs at the Facility during the past several Reporting Years that Defendant failed to monitor. *See* Notice Letter, p. 24.

86.     As a result, Allied Waste has violated Section § XI.B.2 by failing to take the requisite samples from Qualifying Storm Events. On information and belief, Plaintiff alleges Allied Waste would have had additional exceedances of NALs and water quality standards had it sampled all required QSEs.

87.     The General Permit mandates that each sample be analyzed for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant

source assessment (Section X.G)." *Id*., § XI.B.6.2.c. Additionally, the General Permit mandates that each sample be analyzed for "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix." *Id*., § XI.B.6.2.e.

88.    The EPA 303(d) List of Water Quality Limited Segments lists the Dominguez Channel Estuary as impaired for indicator bacteria and the General Permit includes instantaneous maximum TNALs for bacteria, including enterococcus, fecal coliform, and total coliform,

89.    Prior to the 2016-2017 Reporting Year, the Facility analyzed storm water samples for enterococcus and e. coli and had results above the current instantaneous maximum TNALs for bacteria being discharged into Los Angeles Harbor.

90.    The Facility's 2022 SWPPP states that that the Facility used to grind and process green waste, "which would potentially contribute to increase concentrations of ammonia, nitrate, nitrite, total phosphorus, and bacteria, and/or affect dissolved oxygen in the storm water discharge." 2022 SWPPP, p. 12.

91.    The Facility's 2023 SWPPP indicates that Facility still collects and transfers green waste. SWPPP, p. 2-5.

92.    The Facility analyzes storm water samples for COD based on its SIC Code and has had annual NAL exceedances in each of the last five reporting years. In its latest Level 2 ERA Technical Report, the Facility indicated that the likely source for the COD exceedances includes green waste. December 23, 2023 Level 2 Technical Report Update, p. 6.

93.    Plaintiff is informed and believes, and thereon alleges, that indicator bacteria such as enterococcus, fecal coliform, and total coliform are likely to be present at the Facility at levels that exceed the applicable TNAL. Plaintiff is informed and believes, and thereon alleges, that had Allied Waste analyzed the Facility's storm water discharges for indicator bacteria as required, the levels would have exceeded the

TNALs.

94.    Plaintiff is informed and believes, and thereon alleges, that Defendant has failed to analyze storm water discharges from the Facility for indicator bacteria in violation of General Permit, Section XI.B.6 since at least December 10, 2018.

95.    Plaintiff alleges that Defendant has failed and continues to fail to adequately develop, implement, and/or revise the Facility's SWPPP in violation of SWPPP requirements of the General Permit.

96.    The General Permit requires SWPPPs to identify applicable advanced BMPs that are not being implemented at the Facility and provide a justification for their exclusion. General Permit, § X.H.4.b. Given the ongoing high levels of TSS, copper, iron, aluminum, zinc, COD, O&G, and pH measured in the Facility's discharge, in order to comply with the General Permit's BAT/BCT requirement, the Facility's SWPPP must identify additional advanced BMPs necessary to implement the BAT/BCT requirements and achieve the NALs and, and explain why available BMPs are not being implemented at the Facility. Allied Waste is violating Section X.H.4.b because the SWPPP does not identify applicable advanced BMPs that are not being implemented at the Facility and provide a justification for their exclusion.

97.    Plaintiff is informed and believes, and thereon alleges, that the Facility's Level 2 ERA Technical Reports for discharges of TSS, aluminum, copper, iron, zinc, and COD since the 2018-2018 Reporting Year fails to evaluate additional BMPs that would reduce NAL exceedances, fails to provide estimated costs of additional BMPs that would reduce exceedances, and fails to describe the basis for the selection of BMPs implemented in lieu of the additional BMPs evaluated but not implemented in violation of General Permit Section XII.D.2.a.iv.

98.    Information available to Plaintiff indicates that as a result of these practices, storm water containing excessive pollutants is being discharged from the

Facility during rain events to the municipal storm water system which in turn flows to the Dominguez Channel Estuary, which flows into the Consolidated Slip of Los Angeles Harbor, then into Inner Los Angeles Harbor, Outer Los Angeles Harbor, and ultimately the Pacific Ocean.

99.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit. Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

## VI.     CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

100.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

101.     The General Permit's SWPPP requirements and Effluent Limitation V(A) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. Defendant has failed to implement advanced BMPs and BAT and BCT at the Facility for their discharges of TSS, aluminum, copper, iron, zinc, COD, pH, O&G, and other potentially un-monitored pollutants in violation of Effluent Limitations V.A and X.H of the General Permit.

102. Each day since December 10, 2018 that Defendant has failed to develop and implement advanced BMPs and BAT/ BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

103. Defendant has been in violation of the BMP and BAT/BCT requirements every day since at least December 10, 2018. Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

## **SECOND CAUSE OF ACTION**

### **Failure to Prepare, Implement, Review, and Update**
### **an Adequate Storm Water Pollution Prevention Plan**
### **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

104. Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

105. Section X of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

106. Defendant has failed to develop and implement an adequate SWPPP for the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*:

    a. Defendant's failure to identify advanced BMPs at the Facility;

    b. Defendant's failure to justify the exclusion of advanced BMPs at the Facility.

107. Defendant has been in violation of the Permit's SWPPP requirements every day since December 10, 2018. Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**THIRD CAUSE OF ACTION**

**Failure to Develop and Implement an**

**Adequate Monitoring Implementation Plan**

**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

108.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

109.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges).

110.    Defendant has failed to develop and implement an adequate Monitoring Implementation Plan for the Facility. General Permit, §§ X(I), XI. Defendant's ongoing failure to develop and implement an adequate Monitoring Implementation Plan for the Facility is evidenced by Defendant's failure to conduct required sampling and analysis, including Defendant's failure to analyze the Facility's storm water discharges for indicator bacteria since at least December 10, 2018.

111.    Each day since at least December 10, 2018, that Defendant has failed to develop and implement an adequate Monitoring Implementation Plan for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

**FOURTH CAUSE OF ACTION**

**Discharges of Contaminated Storm Water**

**in Violation of Permit Conditions and the Act**

**(Violations of 33 U.S.C. §§ 1311, 1342)**

112.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

113.    Discharge Prohibition III.C of the General Permit prohibits storm water

discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

114.   Plaintiff is informed and believes, and thereupon alleges, that since at least December 10, 2018, Defendant has been discharging polluted storm water from the Facility in excess of the applicable water quality standards for copper, zinc, and pH in violation of Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit.

115.   During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with copper, zinc, and pH at levels above applicable water quality standards. The storm water from the Facility flows untreated into the Dominguez Channel Estuary, which flows into the Consolidated Slip of Los Angeles Harbor, then into Inner Los Angeles Harbor, Outer Los Angeles Harbor, and ultimately the Pacific Ocean.

116.   Plaintiff is informed and believes, and thereupon alleges, that the Facility's discharges of storm water containing zinc in excess of 0.09 mg/L, copper in excess of 0.0048 mg/L, and pH levels of less than 6.5 s.u. greater than 8.5 s.u. are causing or contributing to the violation of the applicable water quality standards in the CTR and the Basin Plan in violation of Receiving Water Limitation VI.A and Discharge Prohibition III.D of the General Permit.

117.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation VI.B of the General Permit.

118.   Every day since at least December 10, 2018 that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

## FIFTH CAUSE OF ACTION

**Failure to Comply with Requirements for Exceedance Response Actions.**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

119.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

120.   Section XII.D.2.a of the General Permit requires that an Industrial Activity BMPs Demonstration Level 2 ERA Technical Report contain, *inter alia*, when implemented BMPs are not expected to eliminate future NAL exceedances: (1) an evaluation of additional BMPs that would reduce or prevent NAL exceedances; (2) estimated costs of additional BMPs evaluated; and, (3) an analysis describing the basis for the selection of BMPs implemented in lieu of the additional BMPs evaluated but not implemented.

121.   Defendant has failed to submit an Industrial Activity BMPs Demonstration Level 2 ERA Technical Report for TSS, COD, aluminum, copper, iron, and zinc that complies with the requirements of Section XII.D.2.a of the General Permit.

122.   Each day since at least December 10, 2018, that Defendant has failed to prepare and submit an Industrial Activity BMP Demonstration Level 2 ERA Technical Report for the Facility that complies with the requirements of Section XII.D.2.a of the

General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). This is an ongoing and continuous violation of the Clean Water Act.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

c.  Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any NALs, and water quality standards;

f.  Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g.  Order Defendant to prepare a SWPPP for the Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

i.   Order Defendant to pay civil penalties of up to $64,618 per day per violation, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

j.   Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

k.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

l.   Award any such other and further relief as this Court may deem appropriate.

Dated: February 8, 2024                Respectfully submitted,


By:   /s/ Rebecca L. Davis
        Rebecca L. Davis
        LOZEAU DRURY LLP
        Attorneys for Los Angeles Waterkeeper